IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-05721 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| RICHARD V. SPENCER, Secretary, | ) | |
| Department of the Navy of the United States,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Louis Phillips worked as a police officer at a Navy base. After repeatedly showing up late or missing work altogether, Phillips was fired. However, Phillips claims that the real reason he was terminated is because he is an African American and because he had previously filed two employment discrimination complaints. He filed the present action against Defendant Richard Spencer, in his capacity as Secretary of the Department of the Navy (the "Navy"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Navy now moves for summary judgment on both Phillips's Title VII claims. (Dkt. No. 26.) For the following reasons, the Navy's motion is granted.

### BACKGROUND

Unless otherwise noted, the following facts are undisputed.

Phillips was employed as a police officer by the United States Navy assigned to Naval Station Great Lakes ("Great Lakes") near North Chicago, Illinois. (Pl.'s Response to Def.'s

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Richard V. Spencer, Secretary, Department of the Navy of the United States, has been substituted as Defendant in place of Ray Mabus, who no longer holds that position.

Statement of Undisputed Material Facts ("RSUMF") ¶ 1, Dkt. No. 38-2.) He began his employment in 2003 and served until his termination in 2012. (*Id.*). Phillips worked the night shift, which began at 10:00 p.m. and ended the next morning at 6:00 a.m. (*Id.*) His primary duty was to patrol the base and ensure that it was secure, as well as to perform other basic police work. (*Id.* ¶ 2)

At all times relevant to this action, Phillips was under the direct supervision of his watch commander, James Pittman. (*Id.* ¶¶ 3–4.) Pittman reported to the deputy chief of police, James Knapp. (*Id.*) Next in the chain of command was the chief of police, a position that was vacant. (*Id.*) Above the chief of police was the director of public safety, David Mims. (*Id.*) Finally, at the top of the chain of command was the executive director of the base, Randall Lynch. (*Id.*) Pittman, Knapp, and Lynch are white, while Mims is an African American. (*Id.* ¶ 4.)

Phillips is an African-American man who had previously complained of racial discrimination at Great Lakes. (*Id.* ¶¶ 2, 5–12.) In September of 2007, Phillips filed an Equal Employment Opportunity ("EEO") complaint, alleging that several Great Lakes officers had used racial epithets in his presence. (*Id.* ¶¶ 5–6.) That complaint was eventually settled. (*Id.* ¶ 8.) Phillips filed another EEO complaint in June 2009, alleging that he was the victim of harassment from a fellow police officer and that his supervisor at the time did nothing to prevent it. (*Id.* ¶ 10.) This second complaint ultimately resulted in the suspension of the officer Phillips accused of harassment. (*Id.* ¶ 12.) Neither of the complaints implicated Pittman, Knapp, Mims, or Lynch— Phillips's superiors who he alleges discriminated against him in the present matter. (*Id.* ¶¶ 7, 11.) However, between 2010 and 2012, Phillips had multiple discussions with Knapp and Mims concerning the culture of racial discrimination at Great Lakes. (Def.'s Response to Pl.'s R. 56.1 Statement of Additional Undisputed Material Facts ("DRPSF") ¶ 29, Dkt. No. 44.) In addition,

Pittman was aware that Phillips had previously filed EEO complaints. (*Id.* ¶¶ 30–31.) Phillips also claims that prior to his termination he told Pittman that he filed a complaint against him. (*Id.* ¶ 30.) While the Navy admits that Phillips told Pittman he had filed an EEO complaint, it denies that Pittman had any knowledge of the substance of the complaint. (*Id.*)

Pittman assumed the position of watch commander, and therefore became Phillips's direct supervisor, in April 2010. (RSUMF ¶ 13.) One of his first acts as watch commander was to enforce the Navy's official leave policy, requiring police officers to request leave from their supervisor if they were going to miss or be late for a shift. (*Id.* ¶ 14; Def.'s R. 56.1 Statement of Facts ("DSF"), Ex. 10 at 39:13–40:7, Dkt. No. 29-2.) Under previous watch commanders, there had been a custom whereby officers calling off simply notified the dispatch center that they would miss or be late for their shift and did not have to request leave from a supervisor. (RSUMF ¶ 14.) While Phillips disputes that Pittman understood Great Lakes policy to require something more than the custom, both Pittman and Phillips's depositions make clear that Pittman was enforcing the Navy's policy, which he understood to apply to Great Lakes. (*Id.* ¶ 14; DSF, Ex. 1 at 41:23–42:10, Dkt. No. 29-2; DSF, Ex. 10 at 39:13–40:7.) Even after Pittman's policy change, Phillips continued only to notify the dispatch center rather than seeking leave from Pittman when he would miss or be late for his shift. (RSUMF ¶ 15.)

Between December 2010 and February 2011, Phillips was late or absent from his shift 15 times. (*Id.* ¶ 18.) In each instance, Phillips never requested leave from his supervisor and therefore Pittman marked him AWOL. (*Id.*) On March 1, 2011, Pittman met with Phillips regarding his unauthorized absences—though Phillips denies that Pittman told him at this meeting that those absences were being marked as AWOLs. (*Id.* ¶ 19.) Ultimately, Pittman proposed that Phillips be

suspended 14 days due to his AWOLs and Knapp approved the suspension on April 27, 2011. (*Id.* ¶ 20; DSF, Ex. 13, Dkt. No. 29-2.)

The sequence of events leading to Phillips's termination began on February 11, 2012, when he arrived 15 minutes late for his shift. (RSUMF ¶ 21.) Phillips had not requested leave from Pittman beforehand, but instead simply notified the dispatch center. (*Id.*) Consequently, he was marked as AWOL. (*Id.*) Phillips also received an AWOL for missing a training scheduled for February 27, 2012. (*Id.* ¶¶ 30–31.) While the Navy states that the training was mandatory and Phillips was notified of that fact by e-mail, Phillips maintains that he was not aware that his attendance at this particular session was mandatory and believed he could make it up at a later time. (*Id.*)

Then, on March 6, Phillips was absent from his shift, again only informing the dispatch center three hours before the start of the shift. (*Id.* ¶ 22.) The next day, after he had already missed the entirety of his shift, Phillips retroactively requested leave stating that he had to attend a family court hearing on the morning of March 7. (*Id.* ¶ 24.) The Navy contends that Phillips knew of the court hearing sufficiently in advance to have requested leave prior to his shift, and in any case, he could have completed the shift and still made it to the courthouse in ample time. (*Id.* ¶¶ 24–26.) Pittman denied Phillips's post hoc leave request and marked him AWOL for the missed shift. (*Id.* ¶ 27.)

Phillips was also subject to discipline for an incident that occurred on March 15, 2012, when he was assigned to "late-car" duty. (*Id.* ¶ 34.) An officer with a late-car assignment was required to stay on duty past the normal end time of his or her shift until relieved of duty by a supervisor. (*Id.* ¶¶ 32–33.) The next morning, at 6:29 a.m., the dispatch center received a call for a burglar alarm. (*Id.* ¶ 35.) While the other officer assigned to late-car duty responded to the alarm,

Phillips did not. (*Id.*) This violated Great Lakes's policy requiring at least two officers to respond to a burglar alarm. (*Id.* ¶ 36.) According to Pittman, the call had come before the late cars were called off at 6:33 a.m., and in any case, Phillips had signed out three minutes before that time. (*Id.* ¶ 37.)

These above-described incidents culminated in Pittman sending a memo to Great Lakes Human Resources regarding Phillips's policy violations. (*Id.* ¶ 44.) As a result of Pittman's memo, Mims held a confrontational meeting with Phillips on April 9, 2012. (*Id.*)

During his May 13, 2012 shift, Phillips used the Great Lakes copy machine to make copies for his private business. (*Id.* ¶ 38.) After an officer reported Phillips using the machine for an extended period of time, Pittman reviewed the copy machine's history and observed that Phillips's copy job exceeded 1,375 pages. (*Id.* ¶ 39.) Moreover, security camera footage showed Phillips making the copies. (*Id.* ¶ 41.) Phillips admitted to making copies during the shift in question but said that he brought his own paper. (*Id.* ¶ 42.) He claimed that he received permission from a superior to use the copier for personal purposes with his own paper, although Pittman denies that any person gave him such permission. (*Id.* ¶ 43; DRPSF ¶ 18)

On May 19, Phillips encountered traffic on his way to work. (RSUMF ¶ 28.) He called his acting supervisor at 9:10 p.m. and informed him of his predicament. (*Id.*) The acting supervisor instructed Phillips to continue driving toward work and to call back in 30 minutes to provide an update on his progress. (*Id.*) Ten or fifteen minutes later, Phillips called back and requested emergency leave because traffic was not moving. (*Id.*) The acting supervisor denied the request as traffic was not a justification for emergency leave. (*Id.*) Nonetheless, Phillips never reported for his shift and was marked AWOL by Pittman. (*Id.* ¶¶ 28–29.)

5

Once again, Pittman sent a memo to Human Resources regarding the copier incident and the May 19 AWOL. (*Id.* ¶ 46.) Mims met with Phillips a second time on May 27. (*Id.* ¶ 47.) Following that meeting, Pittman initiated Phillips's removal by submitting a memorandum to Human Resources. (DRPSF ¶¶ 21, 23) Human Resources determined that Phillips's actions warranted termination, relying primarily on Pittman's memorandum. (*Id.* ¶¶ 21–23.) Based on Human Resources' decision, Mims proposed removal to Lynch, who had final approval. (*Id.* ¶¶ 25.) Ultimately, Mims issued a notice of proposed removal on June 7, 2012 based on Phillips's four 2012 AWOLs, his failure to complete late-car duty, and his use of the base copier. (RSUMF ¶ 48.) Lynch, the executive director of the base, concluded that the charges in the notice of proposed removal were supported by a preponderance of the evidence. (*Id.* ¶ 50.)

Phillips was terminated effective July 27, 2012. (*Id.*; Compl. Ex. A, Dkt. No. 1-1.) Phillips appealed his removal to the Merit Systems Protection Board to no avail. (RSUMF ¶¶ 51–52.) That decision was appealed to the Equal Employment Opportunity Commission ("EEOC"), but the EEOC also found no discrimination associated with Phillips's termination. (*Id.* ¶¶ 55–57.) Phillips then filed the present lawsuit.

**DISCUSSION**

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Phillips has set forth two claims under Title VII. Specifically, he alleges that he was unlawfully terminated on account of

his race and that he was unlawfully terminated in retaliation for engaging in a protected activity—specifically, Phillips's filing of EEO complaints regarding racial discrimination at Great Lakes.[2]

In assessing Title VII claims, courts in this Circuit consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). For a Title VII retaliation claim, the plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that he engaged in a statutorily-protected activity, he suffered a materially-adverse employment action, and there was a but-for causal connection between the two. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). In applying this legal standard, the Court must consider the evidence as a whole, "rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

One way of proving a claim is through the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). This framework allows a Title VII plaintiff to set out a *prima facie* case for discrimination by showing that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees outside of his protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *David*, 846

---

[2] While Phillips's Complaint states that he suffered "adverse employment actions," (Compl. ¶¶ 27, 32, Dkt. No. 1) the Court will consider only his termination because Phillips failed to exhaust his administrative remedies (*i.e.,* filing a charge with the EEOC) with respect to his suspension or any other adverse employment action besides his termination. *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) ("As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." (internal quotation marks omitted)). This issue was raised by the Navy (*see* Def.'s Mem. in Support of Mot. for Summary Judgment at 13–14, Dkt. No. 27) and Phillips's Opposition does not contain any arguments contesting this point.

F.3d at 225. If a plaintiff's evidence establishes a *prima facie* case of unlawful discrimination, "the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). Where the employer carries its burden, the burden shifts back to the plaintiff to establish that the employer's stated non-discriminatory reason is a pretext. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015). This burden-shifting framework operates in the same manner for retaliation claims. *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 665, 657–58 (7th Cir. 2012).

In his opposition to summary judgment, Phillips uses the *McDonnell Douglas* burden-shifting framework to prove his racial discrimination and retaliation claims. While Phillips does briefly address the retaliation claim separately, for the most part neither Phillips nor the Navy distinguishes between the two claims in their arguments. Thus, the Court will analyze the two claims together.

### I. *Prima Facie* Case of Discrimination

The Navy does not dispute that Phillips has established that he is a member of a protected class and he engaged in protected activity when he filed EEO complaints. And although Phillips's disciplinary issues seemingly call into question whether he was meeting his employer's legitimate job expectations, the Navy does not contest this aspect of his *prima facie* case. Instead, the Navy's argument focuses on Phillips's inability to show that other similarly-situated Great Lakes officers outside of his protected class and who did not engage in protected activity were treated more favorably than him.

The similarly-situated inquiry is a "flexible, common-sense examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks omitted). By comparing the plaintiff with similarly-situated employees, the inquiry seeks "to

eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Id.* (internal quotation marks omitted). For an employee to be similarly situated there must be "enough common factors between a plaintiff and a comparator . . . to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). While appropriate comparators "need not be identical [to the plaintiff] in every conceivable way," they must be "directly comparable to the plaintiff in all material respects." *Coleman*, 667 F.3d at 846 (internal quotation marks omitted). Here, Phillips has identified five comparators who he claims were similarly situated to him but treated more favorably.

### A. Adrian Rivera

Phillips identified Adrian Rivera as a Hispanic Great Lakes employee who, like Phillips, used the Great Lakes copier for personal purposes. (RSUMF ¶ 58.) Specifically, Rivera used the copier to make a copy of the Federal Bureau of Investigation's firearms instruction manual, which Rivera did at Phillips's behest because Phillips wanted the manual for his outside business. (*Id.* ¶¶ 59–60.) Unlike Phillips, however, Rivera was not punished for this personal use. (*Id.* ¶ 58.)

There are significant differences between Phillips and Rivera, as well as the circumstances of Rivera's copier use, that weigh against finding Rivera to be similarly situated to Phillips. First, at the time that Rivera used the copier, he did not report to Pittman. (*Id.* ¶¶ 13, 63 (stating that Rivera's copying occurred before 2010, while Pittman only became watch commander in April 2010)). And a comparator is usually not deemed to be similarly situated to a plaintiff when he reports to a different supervisor. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Phillips contends that it makes little difference that Rivera and Phillips had different

watch commanders at the time of their relevant copying activities because those watch commanders all reported to Knapp and applied the same policies to their supervisees. Yet this argument runs up against Phillips's claim that Pittman was the "cat's paw"[3] in Phillips's termination, and Pittman's supervisors merely rubber-stamped his discriminatory actions toward Phillips. (Def.'s Opp'n to Summary Judgment at 7, Dkt. No. 38-1.) Given that Pittman was the relevant decisionmaker, only his supervisees make useful comparators for determining whether Phillips was singled out for unfavorable treatment. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff.").

Perhaps just as importantly, Phillips admits that he does not know if any Great Lakes supervisor ever knew about Rivera's copier use. (RSUMF ¶ 62.) Thus, it is entirely possible that Rivera escaped discipline because nobody other than Phillips knew about his copier use. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (noting that the similarly-situated inquiry requires a showing, among other things, that the two employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them"). Phillips responds that the fact that Rivera's copier use was not observed serves only to show the disparate scrutiny to which Phillips was subjected as compared to his fellow employees. Yet the circumstances of Phillips's use were far different from Rivera's use. While Rivera's copy job was only about 100 pages, Phillips copied over 1,375 pages. (RSUMF ¶¶ 39, 61.) The extent of Phillips's use was of a far greater magnitude than Rivera's use, and thus surely more likely to arouse suspicion. Moreover, even if a Great Lakes

---

[3] "Cat's paw" in employment law refers to an individual who is not the final decisionmaker with regard to disciplinary measures but exercises such singular influence over the decisionmaker that the decisionmaker's determination to take disciplinary action is the product of blind reliance. *Staub v. Proctor Hosp.*, 562 U.S. 411, 415–16 (2011).

supervisor knew of Rivera's personal use, it is reasonable that only Phillips's egregious use would be subject to discipline.

Finally, Phillips has pointed to no evidence that Rivera had any record of disciplinary incidents. *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) ("An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated."). By contrast, Phillips had a record of numerous AWOLs as well as his failure to respond to a burglary that occurred while he was on the late-car shift. Thus, given the many material differences between Rivera and Phillips, the two employees cannot be deemed as similarly situated.

### B. Robert Schultz

For the first time in his opposition to summary judgment, Phillips identifies Robert Schultz as a comparator.[4] Schultz was a white officer who was caught by Knapp sitting in the parking lot waiting for his shift to end instead of finishing his patrol. (DRPSF ¶ 36.) Knapp only verbally counseled Schultz for this infraction. (*Id.*)

According to Phillips, Schultz's behavior was comparable to his signing out before he was called off the late-car shift. In the first place, there is a key difference in the two employees' circumstances. Namely, Phillips failed to respond to a burglar alarm that occurred while he was supposed to be on late-car duty, which was an additional violation of Great Lakes policy. Moreover, Schultz was disciplined by Knapp, not Pittman. Since it was Pittman who is alleged to have acted with discriminatory intent, the disciplinary activity of other supervisors is simply not

---

[4] The Navy argues, without legal citation, that this comparator should be disregarded because he was not identified as a similarly-situated employee in discovery. However, there is no reason to believe that the post-discovery addition of this comparator prejudiced the Navy. *See Oretega v. Chi. Pub. Sch. of the Bd. of Educ.*, No. 11 C 8477, 2015 WL 4036016, at *9 (N.D. Ill. June 30, 2015). Indeed, the Navy adequately argues that there were material differences between Schultz and Phillips. Therefore, this comparator will not be disregarded.

relevant to the similarly-situated analysis. And again, Schultz did not have a comparable disciplinary history to Phillips. Thus, Schultz is not a similarly-situated employee.

### C. Other Comparators

Phillips also points to three non-African American officers who missed the same mandatory training that Phillips missed. (RSUMF ¶¶ 66–67; DRPSF ¶ 33.) While Phillips was marked AWOL for his absence, the three non-African American officers were not disciplined for missing training. However, these comparators suffer many of the same flaws as Rivera and Schultz for purposes of the similarly-situated analysis—namely, Pittman was not their watch commander and they did not have Phillips's disciplinary history. (RSUMF ¶¶ 67–68) For this reason, the three officers cannot be considered similarly situated to Phillips.

In sume, because Phillips is unable to identify any similarly-situated non-African American employees or similarly-situated employees who had not engaged in protected activity, he has failed to set forth a *prima facie* case of discrimination.

## II. The Navy's Non-Discriminatory Reasons for Termination and Pretext

While Phillips's failure to state a *prima facie* case of discrimination or retaliation is sufficient for the Court to grant the Navy's motion for summary judgment, even if Phillips had carried his initial burden, the Navy still successfully articulated non-discriminatory and non-retaliatory reasons for Phillips's termination.

Phillips had a long history of AWOL incidents dating back to December 2010. Before the incidents leading to his termination, Phillips had been suspended for two weeks due to his multiple absences and late arrivals, each of which resulted in him being marked AWOL. Nonetheless, he continued showing up late to work or missing work altogether without notifying his direct supervisor and therefore being marked AWOL. Moreover, he failed to respond to a

burglar alarm that occurred he was still on late-car duty. It is undisputed that all these incidents occurred, and that each one violated the Navy's rules.[5] While any single one of these incidents might not be enough to supply cause for termination, taken together, they gave the Navy a legitimate non-discriminatory reason to fire Phillips.

Although Phillips does not deny that he engaged in all the conduct leading to his termination, he insists that he should never have been disciplined for those actions. Rather, Phillips claims that Pittman unfairly and without Phillips's knowledge imposed disciplinary measures on Phillips in order to manufacture grounds for termination. In other words, the Navy's proffered reasons for his termination were a mere pretext to engage in unlawful discrimination.

Pretext is not shown simply by "an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). To establish pretext, Phillips must show that the Navy's reasons for his termination either: "(1) had no basis in fact; (2) did not actually motivate [his] discharge; or (3) [were] insufficient to motivate [his] discharge." *Id.* On summary judgment, Phillips need only "produce evidence from which a rational trier of fact could infer that the company lied about its proffered reasons for his dismissal." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999).

According to Phillips, Great Lakes never actually enforced the policy requiring officers seeking leave to obtain permission from a direct supervisor. Instead, the observed custom was for officers simply to call into dispatch and inform them of their absence. Yet the evidence shows that Pittman was aware of this custom at the time he became watch commander, and shortly thereafter, began to enforce the Navy's actual written policy, which required officers to obtain advance

---

[5] For purposes of summary judgment, the Court will accept Phillips's claim that he had permission to use the copy machine and therefore will not consider his copy-machine usage a violation of the rules.

permission from a supervisor. (DSF, Ex. 10 at 39:13–40:7.) Phillips does not dispute that the policy enforced by Pittman was in fact the Navy's actual policy. (Def.'s Opp'n to Summary Judgment at 9; Def.'s Reply in Support of Mot. for Summary Judgment, Ex. 52 at 3–4, Dkt. No. 43-1 (copy of the Great Lakes leave policy).) He only points to evidence showing that a different watch commander understood that the official policy was not being enforced at Great Lakes. (Pl.'s L.R. 56.1 Statement of Additional Undisputed Material Facts, Ex. A. ¶¶ 14–15, Dkt. No. 38-5.)

But the general Great Lakes custom and a different supervisor's understanding of policy are irrelevant here. It is Pittman's discriminatory intent that is at issue. Even if Pittman was enforcing the wrong policy, it does not matter absent evidence that the policy was being enforced for discriminatory reasons. *See Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual.") Thus, to create an inference of discriminatory intent, Phillips must produce evidence showing that Pittman enforced the Navy's written policy unevenly across his supervisees. *Cf. Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002) ("Given the inconsistent administration of relevant policy and process under different supervisors, the district court's conclusion that the lack of commonality in supervisors among the correctional officers disciplined for attendance violations precluded an inference of discrimination is not unreasonable."). He has not done so. Instead, the evidence shows that Pittman enforced his leave policy uniformly no matter the officer's race or previous engagement in protected activity. For example, Pittman proposed removal for one white officer and disciplinary measures for another for their failure to follow his leave protocols. (DSF,

Ex. 10 at 58:11–59:21, 92:6–96:24.) Along with Phillips, Pittman identified those two officers as the biggest violators of his leave policy. (*Id.* at 121.)

Phillips also insinuates that Pittman led Phillips to believe that the customary leave policy was still in effect in order to induce him into AWOLs that would justify disciplinary action. In deposition testimony and a sworn declaration, Phillips claims that Pittman never communicated his attendance policy to him, and he was not told in his confrontation meetings that he was even being disciplined for his absences and tardiness. (RSUMF ¶¶ 14, 19; DSF, Ex. 1 at 42:13–43:9; Pl.'s L.R. 56.1 Statement of Additional Undisputed Material Facts, Ex. B, Dkt. No. 38-6.) Yet a reasonable jury would be hard-pressed to believe Phillips's protestations of ignorance given documentation in the record showing that Phillips was informed of the policy. On March 31, 2011, Pittman sent Phillips a notice of proposed suspension. The "To:" line of the memo clearly indicates it was sent to "Ofc. Louis Phillips," and at the end of the notice, Phillips's signature appears under the line "I acknowledge receipt of this letter." (DSF, Ex. 12, Dkt. No. 29-2.) In that memo, Phillips was advised that the reason for his suspension was that he had "repeatedly been late to work, *failed to call in to request leave*, and ha[d] been AWOL on numerous occasions. As a police officer, it is imperative for scheduling purposes *that the command staff be advised of your absence* in sufficient time to ensure appropriate emergency coverage." (*Id.*) The notice then lists the date of each instance that Phillips failed to request time off from his supervisor and the time for which he was marked as AWOL. This notice clearly advised Phillips of the governing leave policy and notified him that his absences and late arrivals were being marked as AWOLs.

Thus, even for purposes of summary judgment, the Court cannot accept Phillips's claims that he was never advised of Pittman's leave policy or made aware that his absences were being marked as AWOLs. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Instead, the evidence shows that nearly a year before the incidents leading up to his termination, Phillips had been put on notice that continued infractions would "result in increased disciplinary action, *to include removal*." (DSF, Ex. 12.) Nonetheless, Phillips continued to miss shifts or show up late without obtaining prior consent. This evidence further strengthens the Navy's claim that it had a legitimate non-discriminatory reason for his termination. And most importantly, it establishes that no reasonable jury could believe that Pittman had withheld from Phillips notice of the policy change or disciplinary measures in order to create a basis for termination that was in reality just pretext for racial discrimination or retaliation for engaging in a protected activity.

Finally, Phillips argues that the Navy's departure from normal procedure in terminating him shows pretext. He first points to testimony showing that the Navy typically gave officers a "last chance" prior to termination. Of course, Phillips had already been suspended once on account of his absences and tardiness, and he had two confrontation meetings prior to his termination. Phillips also argues that the fact that he was not afforded an opportunity to retire or resign in lieu of termination shows pretext. Yet the evidence does not support this claim. Phillips can only point to one officer, Aaron Winscher, who was subject to termination for absences just like Phillips but resigned instead. (RSUMF ¶ 69; DRPSF ¶ 34.) While certain evidence shows that he opted to resign instead of facing termination, that evidence does not establish that the Navy afforded him that opportunity to allow him to avoid termination.[6] (DSF, Ex. 10 at 57:11–15.) At

---

[6] The record contains a Decision on Proposed Removal as to Winscher, suggesting that he was in fact terminated. (DSF, Ex. 51, Dkt. No. 29-2.) Nonetheless, for purposes of summary judgment, the Court will treat the issue of whether Winscher was terminated or resigned as a disputed fact and accept Phillips's contention that he did in fact resign.

most, this evidence shows that Winscher resigned once he was aware that he was subject to termination rather than waiting for a formal decision. (*See id.* ("Winscher was also subject to removal but chose, I believe, resignation in lieu of removal.")) There is no evidence showing that there was a policy or general custom under which employees subject to termination were instead given an opportunity to resign or retire. And in any case, no reasonable jury could conclude that either of these slight deviations in termination procedure transforms the Navy's otherwise legitimate bases for termination into mere pretext.

***

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted). Here, Phillips fails to set forth evidence sufficient to carry either of his burdens under the *McDonnell Douglas* inquiry. Indeed, no record evidence reveals that the Navy's actions were tainted with unlawful animus or were in retaliation for protected activity. Rather, the evidence taken as a whole shows that the Navy terminated Phillips's employment because he routinely flouted its rules. Thus, summary judgment must be granted in the Navy's favor on both the racial discrimination and retaliation claims.

**CONCLUSION**

For the foregoing reasons, the Navy's motion for summary judgment is granted in its entirety.

ENTERED:

Dated: August 31, 2018

_____
Andrea R. Wood
United States District Judge